**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 12, 2012

No. 10-60934

Lyle W. Cayce
Clerk

LUMINANT GENERATION CO. LLC, ET AL.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petitions for Review of a Final Rule of the
United States Environmental Protection Agency

Before STEWART, Chief Judge, and BENAVIDES and GRAVES, Circuit
Judges.

CARL E. STEWART, Chief Judge:

IT IS ORDERED that the opinion previously filed in this case,
*Luminant Generation Co. L.L.C. v. U.S. E.P.A.*, No. 10-60934, 2012 WL
3065315 (5th Cir. July 30, 2012), is WITHDRAWN. The following opinion is
substituted therefore:

No. 10-60934

Two sets of petitioners, hereinafter referred to as "Industry Petitioners"[1] and "Environmental Petitioners,"[2] seek review of the United States Environmental Protection Agency's ("EPA") final rule partially approving and partially disapproving the most recent revision to Texas's State Implementation Plan ("SIP") submitted by the Texas Commission on Environmental Quality ("TCEQ") pursuant to the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq.*[3]  Because we find that the EPA did not act arbitrarily or capriciously, or contrary to law, or in excess of its statutory authority, in its partial approval and partial disapproval of Texas's SIP revision, we deny both petitions for review.

## I. BACKGROUND

*A. Statutory Background*

The CAA "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821-22 (5th Cir. 2003).  Under the CAA, the EPA is responsible for identifying air pollutants and establishing National Ambient Air Quality Standards ("NAAQS") which specify maximum allowable levels of certain types of pollutants in the air.  *Id*. at 822; 42 U.S.C. §§ 7408-7409.  The states are then permitted, "within limits established by [the NAAQS], to enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Virginia Surface Mining and Reclamation Ass'n,*

---

[1] Luminant Generation Co. LLC, Oak Grove Management Co. LLC, Big Brown Power Co. LLC, and Sandow Power Co. LLC.

[2] Environmental Integrity Project, Sierra Club, Environment Texas Citizen Lobby, Inc., Citizens for Environmental Justice, Texas Environmental Justice Advocacy Services, Air Alliance Houston, and Community In-Power and Development Association.

[3] Texas Oil & Gas Association of Business, Texas Association of Manufacturers, and Texas Chemical Council have filed a brief in support of the EPA's partial approval of Texas's SIP.  The state of Texas has filed an amicus brief in support of Texas's SIP, as submitted, in its entirety.

No. 10-60934

452 U.S. 264, 289 (1981).  This federal-state partnership is often described as "cooperative federalism."  *Id.*

To comply with its responsibilities under the Act, each state must create and administer a SIP which provides for the "implementation, maintenance, and enforcement" of NAAQS by setting "emission limitations and other control measures."  42 U.S.C. § 7410(a)(1)-(2). The states have "wide discretion" in formulating their SIPs, *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976), including the "broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements."  *BCCA Appeal Grp.,* 355 F.3d at 822 (citing *Union Elec. Co.*, 427 U.S. at 266 ("So long as national standards are met, the state may select whatever mix of control devices it desires.")).  Once a state creates or revises a SIP, it is submitted to the EPA for review.  42 U.S.C. §§ 7410(a)(1),(k)(1)-(2).

The Act confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements.  *Id.* at § 7410(k)(3).  The EPA must approve the plan in its entirety if it meets the applicable requirements of the Act.  *Id.* at § 7410(k)(3); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981).  If only "a portion of the [SIP] meets all the applicable requirements of [the Act]," the EPA "may approve the [submittal] in part and disapprove the [submittal] in part."  42 U.S.C. § 7410(k)(3).  The EPA may also provide "conditional approval" of a SIP, "based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision."  *Id.* at § 7410(k)(4).

States must periodically revise their SIPs as necessary to ensure continuing compliance with current NAAQS.  *Id.* at § 7410(a)(2)(H).  The EPA must review and approve or disapprove a SIP revision within 18 months of submission.  *Id.* at §§ 7410(k)(1)(B),(2)-(3). The EPA shall disapprove a SIP revision only if "the revision would interfere with any applicable requirement

concerning attainment" of the NAAQS "or any other applicable requirement" of the Act. *Id.* at § 7410(l). If the revision meets all of the applicable CAA requirements, the EPA "shall approve such submittal as a whole." *Id.* at § 7410(k)(3). Once approved by the EPA as meeting the requirements of the Act, the SIP, or the approved portion thereof, is incorporated by reference into the Code of Federal Regulations. *See* 40 C.F.R. § 52.02 (2011).

The CAA provides for shared enforcement of SIPs. A state must include in its SIP, a "program to provide for the enforcement" of the plan. 42 U.S.C. § 7410(a)(2)(C). The program must provide the state permitting authority power to "recover civil penalties in a maximum amount of not less than $10,000 per day for each violation." *Id.* at § 7661a(b)(5)(E). Additionally, the EPA has the power to enforce a SIP by commencing "a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day for each violation, or both[.]" *Id.* at § 7413(b). Such suit may be brought in district court, "and such court shall have jurisdiction to restrain such violation, to require compliance, to assess such civil penalty, to collect any fees owed to the United States . . . and to award any other appropriate relief." *Id.* Finally, any person may commence a civil action on his own behalf against any person who is alleged to have violated an emission standard or limitation in a SIP. *Id.* at § 7604(a). A citizen suit may be brought in district court, which shall have jurisdiction to enforce such an emission standard or limitation and to apply any appropriate civil penalties. *Id.*

In assessing the amount of a civil penalty in either an EPA enforcement action or a citizen suit, the court must consider the penalty assessment criteria outlined in section 7413(e), *i.e.*, the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by

No. 10-60934

the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, the seriousness of the violation, and "other factors as justice may require." *Id.* at § 7413(e).

*B. Facts and Proceedings*

In its final rule[4] which became effective on January 10, 2011, the EPA partially approved and partially disapproved the most recent revision to Texas's SIP which was submitted by the TCEQ in 2006.[5] The portion of the SIP at issue creates an affirmative defense against civil penalties for excess emissions during both planned and unplanned startup, shutdown, and maintenance/malfunction ("SSM") events. The EPA approved the portion of the SIP revision providing an affirmative defense against civil penalties for unplanned SSM events and disapproved the portion of the SIP revision providing an affirmative defense against civil penalties for planned SSM events. *See* 75 Fed. Reg. 68,989, 68,991.

Since the creation of its first SIP in 1972, Texas has provided for special treatment of SSM activity. *See* Tex. SIP § XIV, Rule 12 (Jan. 26, 1972) (providing emissions during "upsets" and "start-up or shutdown . . . may not be required to meet the allowable emission levels"). The revised SIP submitted by Texas in 2000 provided that emissions from SSM activity were "exempt from compliance with air emission limitations established in permits, rules, and orders of the commission" so long as the owner or operator complied with certain reporting, record keeping, and operational requirements. *See* General Air Quality Rules, 25 Tex. Reg. 6727, at § 101.11(b) (July 14, 2000). Further, the exceptions were limited to SSM emissions that "could not have been prevented

---

[4] Approval and Promulgation of Implementation Plans; Texas; Excess Emissions During Startup, Shutdown, Maintenance, and Malfunction Activities, 75 Fed. Reg. 68,989 (Nov. 10, 2010).

[5] 30 Tex. Reg. 4090 (July 15, 2005) (proposed), *amended by* 31 Tex. Reg. 422 (Jan 20, 2006).

No. 10-60934

through planning and design," that "were not part of a recurring pattern," and that did "not cause or contribute to a condition of air pollution." *See id.*

The EPA approved the 2000 SIP revision, determining that the exemptions for emissions during SSM activity contained in the plan met the requirements of the CAA. *See* Approval and Promulgation of Implementation Plans; Texas; Excess Emissions During Startup, Shutdown, Malfunction and Maintenance, 65 Fed. Reg. 70,792 (Nov. 28, 2000). In its approval, the EPA noted that "under the [CAA], all excess emissions during SSM episodes are violations of applicable emission limitations [however,] we believe it would be inequitable to penalize a source for occurrences beyond the company's control. A source has the burden of proving that the excess emissions were due to circumstances beyond the control of the operator or the owner." *Id.* at 70,793. Additionally, the EPA found that the 2000 SIP revision comported with past EPA guidance contained in its policy statements regarding emissions from SSM activity. *Id.* at 70,792–93. These policy statements can be found in a collection of memos that we will refer to as the "Bennett Memos" (1982[6] & 1983[7]) the "Herman Memo" (1999[8]). *Id.* at 70,792.

---

[6] Mem. of Kathleen Bennett, "Policy on Excess Emissions During Startup, Shutdown, Maintenance, and Malfunctions" (Sept. 28, 1982) (providing that "it is reasonable to expect that careful planning will eliminate violations of emissions limitations during [startup and shutdown] periods. . . . [s]imilarly, scheduled maintenance is a predictable event which can be . . . made to coincide with maintenance . . . or other source shutdowns. Consequently, excess emissions during periods of scheduled maintenance should be treated as a violation[.]").

[7] Mem. of Kathleen Bennett, "Policy on Excess Emissions During Startup, Shutdown, Maintenance, and Malfunctions" (Feb. 15, 1983) (recognizing that, in certain situations, excess emissions during startup and shutdown "need not be treated as a violation if the source can show that the excesses could not have been prevented . . . and that bypassing was unavoidable to prevent loss of life, personal injury, or severe property damage.").

[8] Mem. of Steven A. Herman, "State Implementation Plans (SIPs): Policy Regarding Excess Emissions During Malfunctions, Startup, and Shutdown" (Sept. 20, 1999) (providing that "because excess emissions might . . . prevent attainment or interfere with maintenance of [NAAQS], EPA views all excess emissions as violations. . . . Nevertheless, . . . imposition of a penalty for sudden and unavoidable malfunctions . . . may not be appropriate.").

6

No. 10-60934

Additionally, in accordance with the EPA's request,   28 Tex. Reg. 5787, 5787 (July 25, 2003) (proposed), Texas's 2004 SIP revision omitted the language indicating that SSM emissions were "exempt," and substituted language that such emissions would be "subject to an affirmative defense." 29 Tex. Reg. 118, 120 (Jan. 2, 2004) (final).  Further, as a result of changes in state law, Texas also distinguished between emissions resulting from planned SSM activity and all other emission events and proposed providing an affirmative defense for these emissions.  *Id*. at 134 (§ 101.222(b),(c)).  The proposed affirmative defense for scheduled SSM activity required the owner or operator prove "the period of unauthorized emissions . . . could not have been prevented through planning and design."  *Id*. at 134  (§ 101.222(c)(2)).  All other emissions would only be protected if they were "caused by a sudden breakdown of equipment or process, beyond the control of the owner or operator."  *Id*. at 134 (§ 101.222(b)(2)).  The proposed rules stated that the affirmative defense provision would expire on June 30, 2005.  *Id*. at 135 (§ 101.222(h)).

The EPA ultimately gave Texas's 2004 SIP revision "limited approval." *See* Limited Approval and Promulgation of Implementation Plans; Texas; Excess Emissions During Startup, Shutdown and Malfunction Activities, 70 Fed. Reg. 16,129 (Mar. 30, 2005).  The EPA explained that "the rule improves the SIP and is largely consistent with the relevant requirements of the [CAA]" but noted that the provisions allowing for an affirmative defense for scheduled SSM activity were "ambiguous, at best, and inconsistent with the [CAA], at worst, and could create problems with enforcing the underlying applicable emission limits."  70 Fed. Reg. at 16,130.  The EPA stated as follows:

> The EPA's interpretation of [§ 7410] allows an affirmative defense to be asserted against civil penalties . . . for excess emissions activities which are sudden, unavoidable or caused by circumstances beyond the control of the owner or operator . . . . However, EPA

No. 10-60934

> has determined that it is inappropriate to provide an
> affirmative defense for excess emissions resulting from
> scheduled maintenance . . . .

*Id.* at 16,131.  Nevertheless, the EPA approved the 2004 provision, noting section 101.222's expiration date of June 30, 2005, but in doing so, the agency clarified that "if Texas revises its rules to include an affirmative defense for excess emissions in the Texas SIP in the future, the State should ensure . . . that the affirmative defense does not apply to excess emissions from scheduled maintenance activities . . . ." *Id.*  The EPA then granted a request from Texas to extend the affirmative defense's expiration date to June 30, 2006.  *See* Limited Approval and Promulgation of Implementation Plans; Texas; Excess Emissions During Startup, Shutdown and Malfunction Activities, 70 Fed. Reg. 50,205, 50,206 (Aug. 26, 2005).

On January 23, 2006, Texas submitted the revised SIP that is the subject of this appeal.   The 2006 SIP revision provides in part:

(1)    For any emission deemed excessive by the state executive director, no affirmative defense would be available. *See* 30 Tex. Admin. Code § 101.222(a).

(2)    For "unplanned maintenance, startup or shutdown activity," an affirmative defense against civil penalties would be available if the "owner or operator proves . . . all" of the listed criteria, including that "(2) the periods of unauthorized emissions from unplanned [SSM] activity could not have been prevented through planning and design," and "(3) the unauthorized emissions from unplanned [SSM] activity were not part of a recurring pattern," and that the "(9) unauthorized emissions did not cause or contribute to an exceedance of the NAAQS . . . ." *See* 30 Tex. Admin. Code §§ 101.1(108), 101.222(c); *see also id.* §§ 101.1(109), 101.222(b) (providing elements for "upset events").

(3)    For "[p]lanned maintenance, startup, or shutdown activity," an affirmative defense against civil penalties would be available if the "owner or operator proves all" of the criteria listed under the section for unplanned SSM activity, including that "(2) the periods of unauthorized emissions from

No. 10-60934

*unplanned* [SSM] activity could not have been prevented through planning and design," that "(3) the unauthorized emissions from *unplanned* [SSM] activity were not part of a recurring pattern," and that "(9) unauthorized emissions did not cause or contribute to an exceedance of the NAAQS . . . ." *See* 30 Tex. Admin. Code § 101.222(h) (emphasis added). The affirmative defense for planned SSM activity would expire after, at most, two years. *See id.* § 101.222(h)-(i).

Thereafter, as mentioned above, the EPA partially approved and partially disapproved the revisions. 75 Fed. Reg. at 68,991. In finalizing its approval of the portion of the SIP revision containing an affirmative defense for unplanned SSM activity, the EPA stated that section 101.222(a)-(g) "provides an affirmative defense for certain emission events that is consistent with the interpretation of the Act as set forth in our guidance documents." *Id.* at 68,990. The EPA explained that it has "recognized that sources may, despite good practices, be unable to meet emission limitations during periods of startup and shutdown and, that despite good operating practices, sources may suffer a malfunction due to events beyond the control of the owner or operator." *Id.* at 68,992.

The EPA then finalized its disapproval of section 101.222(h)-(j), which contained an affirmative defense for planned SSM activity, 75 Fed. Reg. at 68,991, relying on its past reasoning that "[b]ecause these events are planned, we believe that sources should be able to comply with applicable emission limits during these periods of time." 75 Fed. Reg. 26,892, 26,896 (May 13, 2010). The EPA further stated that it disapproved of the affirmative defense for planned startup and shutdown activity contained in the SIP revision because it found the provisions for such activity to be nonseverable from those for planned maintenance. 75 Fed. Reg. at 68,991. Additionally, the EPA noted that a "defect" in the wording of the affirmative defense, caused by cross-referencing the section for unplanned SSM activity, rendered that defense far broader than would be consistent with the requirements set forth in the Act. *Id.* at 68,991 n.5.

9

No. 10-60934

Environmental Petitioners seek review of the EPA's final rule approving the portion of the SIP revision providing an affirmative defense against civil penalties for excess emissions resulting from unplanned SSM activity.  Industry Petitioners seek review of the EPA's final rule disapproving the portion of SIP revision providing an affirmative defense against civil penalties for excess emissions resulting from planned SSM activity.

## II. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 7607(b), this court has jurisdiction to hear a petition for review of the EPA's approval of a SIP under 42 U.S.C. § 7410.  A petition to review the EPA's approval or disapproval of a SIP is governed by the Administrative Procedure Act.  *See* 5 U.S.C. § 706; *BCCA Appeal Grp.*, 355 F.3d at 824.  The EPA's decision is valid unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action that is in excess of statutory authority will also be set aside.  *Id.* at § 706(2)(C).

"An agency rule is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Tex. Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld."  *Tex. Oil & Gas Ass'n*, 161 F.3d at 934.  Nonetheless, the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  "[T]he focal point for judicial review

should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

"The court applies the two-step *Chevron* analysis to questions involving the EPA's interpretation of the statutes it administers," including the CAA. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984). "If Congress 'has directly spoken to the precise question at issue,' the agency and the court 'must give effect to the unambiguously expressed intent of Congress.'" *Chevron,* 467 U.S. at 842-43. In performing this analysis, the court "employ[s] traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9. "[A] statutory provision cannot be read in isolation, but necessarily derives its meaning from the context provided by the surrounding provisions, as well as the broader context of the statute as a whole." *Khalid v. Holder*, 655 F.3d 363, 367 (5th Cir. 2011).

"If the statute, however, is 'silent or ambiguous with respect to the specific issue,' the court must first assess the administrative decision-making process to determine whether the agency's action is entitled to *Chevron* deference." *United States v. Mead Corp.*, 533 U.S. 218, 226-31 (2001) (quoting *Chevron*, 467 U.S. at 843). "Under *Mead*, Congress must have 'delegated authority to the agency generally to make rules carrying the force of law,' and that agency interpretation claiming deference must have been promulgated in the exercise of that authority." *BCCA Appeal Grp.*, 355 F.3d at 825 (quoting *Mead*, 533 U.S. at 226-27). "If the agency's decision is a result of a sufficiently formal and deliberative process to warrant deference, the second step of *Chevron* requires the court to assess whether the agency's interpretation is 'based on a permissible construction of the statute.'" *Mead*, 533 U.S. at 230 (quoting *Chevron*, 467 U.S. at 843). "If the agency's interpretation is reasonable, it will be upheld." *Smiley v. Citibank, N.A.,* 517 U.S. 735, 744-45 (1996). "Federal courts accord 'great

deference' to the EPA's construction of the [CAA]." *Union Elec. Co.*, 427 U.S. at 266.

Where an issue presented is a challenge to an agency's interpretation of its own regulation, the agency's interpretation is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)).

## III. DISCUSSION

*A. Arguments Raised By Environmental Petitioners*

Environmental Petitioners argue that the EPA's approval of the affirmative defense for unplanned SSM events is in excess of the agency's statutory authority and is not in accordance with the Act. Specifically, petitioners argue that the final rule conflicts with the plain language of the Act authorizing civil penalties in EPA and citizen suit enforcement actions, as well as the Act's requirement that the state permitting authority be able to assess civil penalties. Environmental Petitioners further argue that, even if the affirmative defense against civil penalties for excess emissions resulting from unplanned SSM activity is not contrary to the CAA, the EPA's approval was arbitrary and capricious. Finally, Environmental Petitioners argue that, in approving the affirmative defense for unplanned SSM activity, the EPA altered the meaning of the SIP as submitted by Texas. We address each of these arguments in turn.

*1. In excess of statutory authority & not in accordance with law*

The EPA's decision partially approving the SIP revision containing an affirmative defense for unplanned SSM activity is invalid if it found by this court to be, *inter alia,* "not in accordance with law" or in excess of the agency's statutory authority. 5 U.S.C. § 706(2)(A),(C). As stated above, the Act confines the EPA to reviewing SIPs for consistency with the Act's requirements. 42

U.S.C. §§ 7410(k)(3); 7410(a)(1). The EPA "shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment" or "or any other applicable requirement" of the Act. *Id.* at § 7410(l). Further, as pointed out by petitioners, the CAA provides that, in the case of EPA enforcement and citizen suits, a federal district court "shall have jurisdiction" to assess a "civil penalty." *Id.* at §§ 7413(b); 7604(a). In assessing the amount of a civil penalty in either an EPA enforcement action or a citizen suit, the court must consider the penalty assessment criteria outlined in section 7413(e). *Id.* at § 7413(e). Additionally, the CAA mandates that the state permitting authority have the power to recover civil penalties for violations under the Act. 42 U.S.C. § 7661a(b)(5)(E).

The EPA construes section 7413 of the Act as authorizing affirmative defenses against civil penalties if the defense is "narrowly tailored" to address unavoidable, excess emissions and consistent with the penalty assessment criteria set forth in section 7413(e). Accordingly, this court must determine if the EPA's interpretation of section 7413 is entitled to *Chevron* deference. *Chevron*, 467 U.S. at 843. We hold that it is.

As an initial matter, we note that the EPA's procedure of "notice-and-comment rulemaking" and "adjudication" is generally a sufficiently formal and deliberative process. *Mead Corp.*, 533 U.S. at 229-30. Therefore, "[t]he court applies the two-step *Chevron* analysis to questions involving the EPA's interpretation of the statutes it administers." *Chevron,* 467 U.S. at 842-43. "If Congress 'has directly spoken to the precise question at issue,' the agency and the court 'must give effect to the unambiguously expressed intent of Congress.'" *Id.* If the statute, however, is "silent or ambiguous with respect to the specific issue," the court must assess whether the agency's interpretation of the Act is "based on a permissible construction of the statute" and, therefore, entitled to *Chevron* deference. *Chevron*, 467 U.S. at 843.

No. 10-60934

Thus, under *Chevron* step one, we begin by looking at whether the statute is silent or ambiguous with regard to the specific issue in dispute. Here, section 7413 does not discuss whether a state may include in its SIP the availability of an affirmative defense against civil penalties for unplanned SSM activity. 42 U.S.C. § 7413. Accordingly, we turn to step two of *Chevron* and ask whether the EPA's interpretation of section 7413, as authorizing an affirmative defense for unplanned SSM activity, is entitled to deference. *Chevron*, 467 U.S. at 843.

The EPA submits that its "interpretation of the CAA is that it is not appropriate for SIPs to exempt periods of startup, shutdown, maintenance or malfunction from compliance with applicable emission limits." 75 Fed. Reg. at 68,991-92. To support this interpretation, the agency relies on section 302(k) of the Act which defines "emission limitation" and includes a requirement that emissions be limited on a continuous basis. *Id*. at 68,992; 42 U.S.C. § 7602(k).

Further, noting its authority to assess civil penalties under section 7413 of the Act, the agency reasons that an effective enforcement program must be able to collect penalties to deter avoidable violations. 42 U.S.C. § 7413. The EPA recognizes, however, that "sources may, despite good practices, be unable to meet emission limitations during periods of startup and shutdown and, that despite good operating practices, sources may suffer a malfunction due to events beyond the control of the owner or operator." *Id*. at 68,992. For this reason, the agency submits that a SIP "should only provide [an affirmative defense against civil penalties] for circumstances where it is infeasible to meet the applicable limit and the criteria that the source must prove should ensure that the source has made all reasonable efforts to comply." *Id*. at 68,992-93; 42 U.S.C. § 7413(e).

As a result, the EPA states that it has adopted an interpretation of section 7413 that would allow sources to assert an affirmative defense for periods of unavoidable, excess emissions during certain SSM activity in an enforcement action for penalties, though not in an action for injunctive relief. *Id*. at 68,992.

14

No. 10-60934

The agency concludes that this interpretation is consistent with the Act because the criteria a source must prove when asserting the affirmative defense are consistent with the penalty assessment criteria identified in section 7413(e), which are considered by the courts and the EPA in determining whether or not to assess a civil penalty for violations and, if so, the amount. *Id*. at 68,992; 42 U.S.C. § 7413(e). Thus, the affirmative defense criteria are tailored to ensure that the source has made all reasonable efforts to comply with emission limitations and remain in compliance with the Act. *Id*. at 68,992. Consequently, the agency reasons that an appropriately crafted affirmative defense is one that is narrowly tailored to address unavoidable, excess emissions and consistent with the penalty assessment criteria in section 7413(e). *Id*. at 68,992; 42 U.S.C. § 7413.

The approved portion of Texas's SIP that contains an affirmative defense for unplanned SSM activity provides, as an initial matter, that sources are generally subject to enforcement actions for any "upset" events, *i.e.*, an unplanned and unavoidable malfunction that results in unauthorized emissions. 30 Tex. Admin. Code § 101.1(109). If an "upset" event is considered an "excessive" emission event based on a number of factors including frequency, duration, impact on human health, and other measures, no affirmative defense is available. *Id*. at § 101.222(a)-(b). If the violation is not deemed "excessive," and it occurred during unplanned SSM activity, and nine additional criteria are met, including a demonstration that the unauthorized emissions "did not cause or contribute to an exceedance of the NAAQS, PSD increments, or a condition of air pollution," and that the unauthorized emissions "could not have been prevented through planning and design," then the affirmative defense is available. *Id*. at § 101.222(b),(c). Regardless, even if all nine required criteria

15

are met and the violator establishes the applicability of the approved affirmative defense, injunctive relief is still available.  75 Fed. Reg. at 68,991 n.4.[9]

The EPA submits that the above-mentioned affirmative defense for unplanned SSM events is narrowly tailored to address unavoidable, excess emissions and consistent with the penalty assessment criteria in section 7413(e). Thus, it approved this portion of Texas's SIP revision as being consistent with section 7413 of the Act.   42 U.S.C. §§ 7413, 7410(l).   We hold this to be a permissible interpretation of section 7413, warranting deference.  *Chevron*, 467 U.S. at 843.  Accordingly, the EPA acted neither contrary to law nor in excess of its statutory authority when it based its partial approval of the plan on this construction.  5 U.S.C. § 706(2)(A),(C).

*2. Arbitrary and Capricious*

Environmental Petitioners argue that, even if the affirmative defense for unplanned SSM activity is not contrary to the CAA, the EPA's approval was nonetheless arbitrary and capricious.  They argue that the EPA failed to explain why it approved the affirmative defense in light of (1) the EPA's position that affirmative defenses should not be available where a small group of sources could cause exceedance of the NAAQS; (2) precedent indicating that civil penalties serve to encourage compliance with the Act; and (3) the burden an affirmative defense would place on citizen suits.

The EPA's decision is not valid if found by this court to be arbitrary or capricious.  5 U.S.C. § 706(2)(A).  "An agency rule is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

---

[9] Additionally, the availability of the affirmative defense does not negate the district court's jurisdiction to assess civil penalties using the criteria outlined in section 7413(e), or the state permitting authority's power to recover civil penalties, it simply provides a defense, under narrowly defined circumstances, if and when penalties are assessed.

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n*, 161 F.3d at 933. "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Id.* at 934.

With respect to their first argument, Environmental Petitioners are correct that the EPA has stated in its past policy guidance that "[w]here a single source or small group of sources has the potential to cause an exceedance of the NAAQS or PSD increments . . . an affirmative defense approach will not be adequate to protect public health and the environment . . . ."[10] Petitioners are also correct that the approved affirmative defense provision does not contain specific language excluding emissions caused by "a single source or small group of sources" that could potentially "cause an exceedance of the NAAQS or PSD increments." But, as pointed out by the agency in its brief, the affirmative defense excludes *all* emissions that could "cause or contribute to an exceedance of the NAAQS, PSD increments, or a condition of air pollution." 30 Tex. Admin. Code § 101.222 (b)(11), (c)(9). Thus, the approved portion of the affirmative defense is not inconsistent with the agency's past policy guidance.

Environmental Petitioners' remaining two arguments as to why the EPA's approval of the affirmative defense was arbitrary and capricious are also unavailing. Environmental Petitioners are correct that the EPA has recognized that the availability of civil penalties serves as an incentive for companies to take actions to avoid excess emissions. 75 Fed. Reg. at 68,999. In its partial approval of the SIP revision, however, the EPA further recognized that while "the availability of civil penalties serves as an incentive for companies to be more cautious, to take more preventative actions, and to seek to develop technologies and management practices to avoid excess emissions[,] . . . the criteria a source

---

[10] *See infra* Mem. of Steven A. Herman, "State Implementation Plans (SIPs): Policy Regarding Excess Emissions During Malfunctions, Startup, and Shutdown" (Sept. 20, 1999).

would need to prove in order to successfully assert an affirmative defense will encourage companies to take such caution." *Id.* at 68,999.

The EPA's reasoning relies on the fact that the narrowly tailored affirmative defense presents a high burden for any company seeking entitlement to it. Assuming the violation is not deemed "excessive," and it occurred during unplanned SSM activity, nine additional criteria must be met, including a demonstration that the unauthorized emissions "did not cause or contribute to an exceedance of the NAAQS, PSD increments, or a condition of air pollution," and that the unauthorized emissions "could not have been prevented through planning and design." 30 Tex. Admin. Code § 101.222(c). This reasoning supports the EPA's position that its approval of the affirmative defense for unplanned SSM activity will not serve as a disincentive for companies to avoid excess emissions. Thus, there is no conflict with the agency's previous statements that civil penalties encourage compliance with the Act.

Environmental Petitioners' second argument that the affirmative defense places an unreasonable burden on plaintiffs is also without merit. Environmental Petitioners contend that the affirmative defense only requires a "prima facie showing" by defendants, after which the burden will shift to the plaintiffs to show that the affirmative defense does not apply. As pointed out by the EPA, however, when a source asserts the affirmative defense, it has the burden of proving the "enumerated factors, including that the period of excess emissions was minimized to the extent practicable and that the emissions were not due to faulty operations or disrepair of equipment." 75 Fed. Reg. at 68,992 (citing *see* 30 Tex. Admin. Code § 101.222(b),(c)). The provision makes no reference to a prima facie showing. *Id.* Accordingly, the burden remains on the party seeking entitlement to the affirmative defense, not a plaintiff seeking relief under the Act. Given these facts, we agree with the EPA's position that the

approved affirmative defense for unplanned SSM activity does not place an unreasonable burden on plaintiffs.

Consequently, we hold that the EPA did not act arbitrarily or capriciously in its partial approval of the SIP revision. The above-mentioned reasons and policy choices provided by the EPA for approving the affirmative defense for unplanned SSM activity "conform to minimal standards of rationality"; therefore, they are reasonable and will be upheld by this court. *Tex. Oil & Gas Ass'n*, 161 F.3d at 934.

*3. Alteration of the meaning of the SIP*

Environmental Petitioners' final argument is that, by approving the affirmative defense for unplanned SSM activity, the EPA impermissibly altered the meaning of the SIP by making the defense potentially applicable to citizen and EPA enforcement actions, thereby limiting injunctive relief available under the Act and delaying the enforcement of excess emission violations. Environmental Petitioners identify a statement by the TCEQ that "its rules are not intended to nor do they impact citizens' legal rights under the [CAA]." 30 Tex. Reg. at 8922.

Environmental Petitioners are correct that, in partially approving a SIP, the EPA may not "overid[e] state policy," *Bethlehem*, 742 F.2d at 1036-37, and alter the meaning of the SIP. In its partial approval of the SIP revision, however, the EPA reasoned as follows: "[A]pproval of the provisions in sections 101.222(b), (c), (d), and (e) into the Texas SIP does not preclude citizen suits under the Act. Rather, the affirmative defense may be raised in defense of a claim brought by EPA, the State or a private citizen." 75 Fed. Reg. at 68,999. The EPA went on to state that "even where an affirmative defense is successfully raised in defense to an action for penalties, it does not preclude other judicial relief that may be available, such as injunctive relief or a requirement to mitigate past harm or to correct the non-compliance at issue." *Id*.

No. 10-60934

The above-mentioned reasoning provided by the EPA supports its position that it did not alter the meaning of the SIP or broaden its application beyond what Texas intended in its partial approval of the plan. We therefore reject Environmental Petitioners' argument.

## B. Arguments Raised By Industry Petitioners

Industry Petitioners argue that the portion of the SIP revision containing the affirmative defense for planned SSM activity fully complies with the CAA and should have been approved by the EPA and that the EPA's disapproval was contrary to law. They further argue that the EPA's decision was arbitrary and capricious. In the alternative, Industry Petitioners argue that the EPA should have severed and approved the affirmative defense for planned startup and shutdown activity, even if it disapproved the affirmative defense for planned maintenance activity. Industry Petitioners also request that approval of the SIP be backdated to June 30, 2006, so as to eliminate any gap between the expiration of the previous affirmative defense and the current affirmative defense.

### 1. Compliance with the CAA

The EPA's decision partially disapproving the SIP revision containing an affirmative defense for planned SSM activity is invalid if it is found by this court to be, *inter alia*, "not in accordance with law." 5 U.S.C. § 706(2)(A). The Act provides that the EPA "shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment" of NAAQS or "or any other applicable requirement" of the Act. *See* 42 U.S.C. § 7410(l).

The EPA interprets section 7413 of the Act as only authorizing affirmative defenses that are narrowly tailored to address periods of unavoidable, excess emissions during certain SSM activity, "where it is infeasible to meet the applicable limit." Consequently, the agency concludes that section 7413 does not authorize an affirmative defense for planned SSM activity. Accordingly, this

court must determine if the EPA's interpretation of section 7413 is entitled to *Chevron* deference. *Chevron*, 467 U.S. at 843. We hold that it is.

As stated, the EPA's procedure of "notice-and-comment rulemaking" and "adjudication" is generally a sufficiently formal and deliberative process. *Mead Corp.*, 533 U.S. at 229-30. Therefore, "[t]he court applies the two-step *Chevron* analysis to questions involving the EPA's interpretation of the statutes it administers." *Chevron,* 467 U.S. at 842-43. "If Congress 'has directly spoken to the precise question at issue,' the agency and the court 'must give effect to the unambiguously expressed intent of Congress.'" *Id*. If the statute, however, is "silent or ambiguous with respect to the specific issue," the court must assess whether the agency's interpretation of the Act is "based on a permissible construction of the statute" and, therefore, entitled to *Chevron* deference. *Chevron*, 467 U.S. at 843.

Thus, under *Chevron* step one, we begin by looking at whether the statute is silent or ambiguous with regard to the specific issue in dispute. Here, section 7413 does not discuss whether a state may include in its SIP the availability of an affirmative defense against civil penalties for planned SSM activity. 42 U.S.C. § 7413. Accordingly, we turn to step two of *Chevron* and ask whether the EPA's interpretation of section 7413, as not authorizing an affirmative defense against civil penalties for planned SSM activity, is entitled to deference. *Chevron*, 467 U.S. at 843.

As stated, relying on the definition of "emission limitation" found in section 302(k) of the Act, the EPA submits that its "interpretation of the CAA is that it is not appropriate for SIPs to exempt periods of startup, shutdown, maintenance or malfunction from compliance with applicable emission limits." 75 Fed. Reg. at 68,991-92; 42 U.S.C. § 7602(k).

Citing its authority to assess civil penalties under section 7413 of the Act, the agency reasons that an effective enforcement program must be able to collect

penalties to deter avoidable violations.  42 U.S.C. § 7413.  Further, while the EPA acknowledges that "sources may, despite good practices, be unable to meet emission limitations" during certain SSM activity, the EPA's interpretation of section 7413 only allows sources to assert an affirmative defense for periods of unavoidable, excess emissions "where it is infeasible to meet the applicable limit." *Id*. at 68,992.  For this reason, a SIP "should only provide [an affirmative defense against civil penalties] for circumstances where it is infeasible to meet the applicable limit and the criteria that the source must prove should ensure that the source has made all reasonable efforts to comply." *Id*. at 68,992-93; 42 U.S.C. § 7413.  Consequently, the agency reasons that an appropriately crafted affirmative defense is one that is narrowly tailored to address unavoidable, excess emissions.

The EPA submits that the portion of the SIP revision providing an affirmative defense for planned SSM activity is inconsistent with section 7413 of the Act because it is not narrowly tailored to address unavoidable, excess emissions. *Id*. at 68,992.  The agency supports this position by submitting that it does not "believe that it is infeasible for sources to meet applicable limits during planned maintenance" activities. *Id*. at 68,993.  The agency reasons that because planned maintenance activities are predictable, a source can avoid excess emissions from these activities by scheduling maintenance during shutdown periods. *Id*. at 68,992.  Consequently, the agency concludes that the affirmative defense for planned SSM activity is inconsistent with section 7413 of the Act.

The EPA contends that the provision is further inconsistent with section 7413 because it is potentially broadly applicable.  This is because it contains a "defect" that could be interpreted as not requiring a source to establish all elements of the affirmative defense. *See* 75 Fed. Reg. at 68,9991 n.5.  The Industry Petitioners, joined by the State of Texas in its *amicus* brief, argue that

22

the EPA's position that the provision contains a defect is "unfounded" and "ignores [the SIP's] express language." They assert that "§ 101.222(h) is clear that a source must prove 'all' of the criteria listed in the cross-referenced sections, not just the ones it deems applicable." We do not agree.

The EPA's interpretation of *approved* SIP regulations, and not the state's, is authoritative. *See Am. Cyanamid Co. v. U.S. E.P.A.*, 810 F.2d 493 (5th Cir. 1987) (emphasis added). However, the portion of the SIP provision containing an affirmative defense for planned SSM activity is not an approved SIP regulation, and thus, is considered Texas law until it receives approval by the EPA and is subsequently incorporated in the Code of Federal Regulations. *See* 40 C.F.R. § 52.02 (2011). Accordingly, the EPA's authority under the CAA is limited to determining whether the proposed SIP revision providing an affirmative defense for planned SSM activity, as written, complies with the Act.

The plain text of section 101.222(h), and referenced section 101.222(c), supports the EPA's reasoning that the provision, when applied, may not require a source owner or operator to establish all elements of the affirmative defense. If a source owner or operator who is conducting planned SSM activity seeks to avail himself of the affirmative defense in section 101.222(h), the provision states that he must prove "all of the criteria listed in subsection (c)(1)–(9) of this section for emissions, or subsection (e)(1)–(9) of this section for opacity events . . . ." *See* 30 Tex. Admin. Code § 101.222(h). Thus, in order to determine which criteria he must prove, he must refer to section 101.222(c). Section 101.222(c), however, refers to the elements that must be proved to establish an affirmative defense for emissions or opacity resulting from *unplanned* SSM activity. Further, with regard to emissions, the elements themselves are limited to emissions from *unplanned* maintenance. The only elements in section 101.222(c) not limited to emissions from unplanned SSM activity are those relating to reporting, monitoring, a requirement to operate "in a manner consistent with

No. 10-60934

good practices for minimizing emissions," and a requirement that "unauthorized emissions did not cause or contribute to an exceedance of the NAAQS, PSD increments, or a condition of air pollution." *See id*. § 101.222(1),(5),(7),(9).

As a result, a source owner or operator conducting planned SSM activity applying the plain text of section 101.222(c) would find that the majority of the criteria contained in the section refer to unplanned SSM activity, and consequently, find those criteria not applicable to himself as a source owner or operator conducting *planned* SSM activity. 30 Tex. Admin. Code § 101.222(c)(2),(3),(4),(6),(8). Even if the source owner or operator conducting planned SSM activity attempted to prove all nine criteria in subsection (c), he could not do so since five of the nine criteria are specifically limited to descriptions of unplanned SSM activity. *Id*. In reference to this section, the EPA stated as follows:

> [I]nstead of identifying the criteria a source must meet to assert an affirmative defense for planned activities, the Texas rule cross-references the criteria that apply for unplanned events. Thus, sources might argue that many of the criteria would not apply and would not need to be proved when asserting an affirmative defense. The criteria that a source must prove in asserting a defense are critical for ensuring that the defense will not be abused.

75 Fed. Reg. at 68,991 n.5.

In its partial disapproval of the SIP revision, the EPA relied on the above-mentioned reasoning and concluded that the affirmative defense for planned SSM activity was inconsistent with section 7413 of the Act because: (1) it was potentially broadly applicable due to the cross-referencing in subsection (h) to subsection (c); and, (2) not narrowly tailored to address unavoidable, excess emissions because it provided a defense for SSM activities during which excess emissions could be avoided. *See* 42 U.S.C. §§ 7413, 7410(l). We hold this to be

No. 10-60934

a permissible interpretation of section 7413 of the Act, warranting deference. *Chevron*, 467 U.S. at 843; 42 U.S.C. § 7413. Accordingly, the EPA did not act contrary to law when its based its partial disapproval of the plan on this construction. 5 U.S.C. § 706(2)(A).

*2. Arbitrary and Capricious*

Industry Petitioners submit several arguments in support of their assertion that the EPA's partial disapproval of the SIP revision was arbitrary and capricious. We address each of these in turn.

As previously stated, the EPA's decision is not valid if found by this court to be arbitrary or capricious. 5 U.S.C. § 706(2)(A). On the other hand, "[i]f the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Tex. Oil & Gas Ass'n*, 161 F.3d at 934.

Citing *GHASP v. U.S. E.P.A.*, 289 F. App'x 745 (5th Cir. 2008), Industry Petitioners argue that the EPA must approve any SIP revision that is more stringent than the preexisting SIP. In 2000, the EPA approved a Texas excess emissions rule that included an exemption for emissions from planned maintenance. *See* 65 Fed. Reg. 70,792 (Nov. 28, 2000); 25 Tex. Reg. 6727-6751 (July 14, 2000). In its brief, however, the EPA points out that it has publicly conceded that its approval of the Texas 2000 rule was erroneous.[11] It is the agency's position that it should not be required to make the same mistake twice for the sole purposes of consistency.

An agency is not bound to follow a prior, incorrect interpretation of its own policy. *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). Moreover, an agency is permitted to change its policy interpretations. *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 514-15 (2009); *National Cable &*

---

[11] Technical Support Document for 30 Tex. Admin. Code Chapter 101, General Air Quality Rules, Rule Log Numbers 2001-075-101-AI & 2003-038-101-AI (March 2, 2004).

No. 10-60934

*Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981 (2005). Consequently, we hold that the EPA's previous, admittedly erroneous, approval of a prior Texas SIP provision, does not mandate its approval of the current SIP revision at issue, simply because it is more stringent than the provision previously approved in error.

Industry Petitioners next argue that the EPA, in partially disapproving the SIP revision, impermissibly made the SIP more stringent than what Texas had intended, *i.e.*, a SIP without any accommodation for planned SSM emissions. We disagree.

The EPA may approve or disapprove a provision in a SIP, but may not require a state to add any provision to its proposal. *See Fla. Power & Light Co.*, 650 F.2d at 587-89. Further, the EPA may not exercise its power to partially approve and disapprove portions of a SIP to make it more stringent than intended by the state. *See Bethlehem Steel*, 742 F.2d at 1034-35.

In its partial disapproval of the SIP, the EPA noted the following:

> The provisions being disapproved address completely separate activities . . . (planned activities) from those addressed by the provisions being approved (unplanned activities). The approved provisions will provide the exact limited relief intended by the State for sources covered by those provisions . . . . EPA's action disapproving similar relief for excess emissions during planned activities does not affect the stringency of the defense being approved for periods of excess emissions during unplanned activities.

75 Fed. Reg. at 68,993. This reasoning supports the EPA's position that its partial disapproval of the SIP did not make the remaining approved portions more stringent than what Texas had intended.

Industry Petitioners next argue that the EPA's partial disapproval of the SIP revision was in error because the agency never established that the

affirmative defense for planned SSM activity "would interfere" with NAAQS attainment.  42 U.S.C. § 7410(l).

With respect to this issue, the EPA stated that it does not interpret the Act as requiring it to demonstrate that there will be a violation of NAAQS if it disapproves a SIP revision.  75 Fed. Reg. at 68,994.  The agency further noted that "the language in section 110(l) provides that EPA must disapprove a SIP revision if it 'would interfere with any applicable requirement concerning attainment.'  This is quite distinct from an obligation to prove that a violation will occur." *Id.*

We agree with the EPA's position that it is not required by the Act to prove that a violation will occur as a prerequisite to disapproving the plan.  However, in disapproving a plan, the agency is required to provide  reasoning supporting its conclusion that the disapproved provision would interfere with an applicable requirement of the Act.  42 U.S.C. § 7410(l).  As stated, the agency has provided sufficient reasoning supporting its conclusion that the affirmative defense for planned SSM activity was inconsistent with section 7413 of the Act because: (1) it was potentially broadly applicable due to improper cross-referencing; and, (2) it was not narrowly tailored to address unavoidable, excess emissions because it provided a defense for SSM activities during which excess emissions could be avoided.  Consistent with our previous holding that this conclusion is a permissible construction of the statute that is not contrary to law, we hold the same conclusion to be a sufficient basis for the agency's partial disapproval of the plan  pursuant  to  sections  7413  and  7410(l).    42  U.S.C.  §§  7413,  7410(l)

Industry Petitioners also argue that the EPA was required to approve the affirmative defense scheme as a necessary step to Texas's transition to a permitting scheme.  In support of their argument, Industry Petitioners point to the doctrines of "administrative necessity" and "one-step-at-a-time."  *See Ala. Power Co. v. Costle*, 636 F.2d 323, 357-60 (D.C. Cir. 1979); *U.S. Brewers Ass'n,*

No. 10-60934

*Inc. v. EPA*, 600 F.2d 974, 982 (D.C. Cir. 1979).  With respect to this issue, the EPA provided the following response:

> [T]he State's submitted phased-in permitting process will not serve to modify any applicable requirement under the Texas SIP. Furthermore, our action disapproving the three provisions at issue . . . merely maintains the status quo and should have no effect on that permitting process.
>
> . . . .
>
> [S]ources have been obligated to comply at all times with the applicable emission limits with no enforcement discretion or affirmative defense provisions since the previous Texas rules expired from the Texas SIP on June 30, 2006 by their own terms. Thus there is no administrative necessity or "one step at a time" argument applicable in this situation.

75 Fed. Reg. at 69,899-900.  This reasoning supports the EPA's position that it was not required to approve the provision containing an affirmative defense for planned SSM activity in light of Texas's transition to a permitting scheme.

Consequently, we hold that the EPA did not act arbitrarily or capriciously in its disapproval of the portion of the SIP revision containing an affirmative defense for planned SSM activity.  The above-mentioned reasons provided by the EPA for disapproving the provision "conform to minimal standards of rationality"; therefore, they are reasonable and will be upheld by this court.  *Tex. Oil & Gas Ass'n*, 161 F.3d at 934.

*3. Severability of planned startup and shutdown activity*

Industry Petitioners also argue that the EPA should have severed and approved the affirmative defense for planned startup and shutdown activity, even if it had determined that there should be no affirmative defense for planned maintenance activity.  We disagree.

Congress, through the CAA, delegates authority to the EPA to partially approve and partially disapprove a SIP.  42 U.S.C. § 7410(k)(3).  The statutory

language indicates that the EPA's exercise of its partial approval power is discretionary, and the EPA may reject a SIP revision in its entirety if it believes any portion violates "applicable requirements." *Id.* (providing, "[i]f a portion of the plan revision meets all the applicable requirements of this chapter," the EPA "*may* approve the plan revision in part and disapprove the plan revision in part" (emphasis added)).

The EPA has determined that the provisions relating to planned startup and shutdown activities are not severable from the planned maintenance provisions. 75 Fed. Reg. 68,991, 68,997. Additionally, as pointed out by the EPA, the drafting defect attendant to the affirmative defense for planned maintenance is also present for the affirmative defense for planned startup and shutdown activity. The EPA expressly identified this deficit in rejecting the affirmative defense for planned startup and shutdown activity. *Id.* at 68,991 n.5. In its promulgation of the final rule, the EPA provided the following reasoning:

> [W]e interpret the CAA to allow EPA to approve a SIP revision submittal from a State that provides an affirmative defense for excess emissions during planned startup or shutdown activities, but the inclusion of planned maintenance activities and the failure to include appropriate criteria (due to improper cross-referencing) for planned startup and shutdown activities renders the submitted section 101.222(h) unapprovable.

*Id.* at 68,997.

For the same reasons provided in our discussion above upholding the EPA's disapproval of the affirmative defense for planned maintenance activity contained in 101.222(h), we uphold the EPA's disapproval of the affirmative defense as it applies to planned startup and shutdown activity. Regardless of whether the activity at issue is planned maintenance or planned startup/shutdown, the improper cross-referencing in subsection (h) to subsection

(c) leads to an overly-broad applicability of the defense.  In addition, as stated, it is within the agency's discretion to exercise its partial approval and disapproval power with regard to SIP submittals.  42 U.S.C. § 7410(k)(3).

Because we conclude that the above-mentioned reasoning provided by the EPA "conform[s] to minimal standards of rationality," *Tex. Oil & Gas Ass'n*, 161 F.3d at 934, we hold that the EPA was not arbitrary or capricious, or contrary to law, in disapproving the provision as a whole.

*4. Backdating approval of the SIP*

In their final argument, Industry Petitioners request that approval of the SIP be backdated to June 30, 2006.  In light of our conclusion that the EPA was not arbitrary, capricious, or contrary to law, when it disapproved the portion of the SIP revision containing an affirmative defense for planned SSM activity, we pretermit discussion of this issue.

## IV. CONCLUSION

For these foregoing reasons, we conclude that the EPA did not act arbitrarily or capriciously, contrary to law, or in excess of its statutory authority, in its partial approval and partial disapproval of Texas's SIP revision.  We therefore deny the petitions for review submitted by both Environmental Petitioners and Industry Petitioners.

**PETITIONS DENIED.**